21-1143 Thompson v. Ragland and for the appellant Mr. Raiken you may proceed. Good morning your honors and may it please the court. I would like to reserve three minutes please for rebuttal. This case actually is a very simple case about how much a university may how much speech a university may restrict by a student. The university in essence is arguing that it should have unlimited power. It should not. I think the facts here are immensely important so I'll do a brief recitation of the facts. Plaintiff Miss Thompson is a student at Metro State University MSU. Defendant Mr. Ragland is an administrator there. Miss Thompson had a disagreement with the professor at MSU in early February of 2019. As a result there was an That's not a problem. Nobody is questioning that. MSU absolutely has every right to take reasonable disciplinary steps. Miss Thompson then encouraged other MSU students to leave a quote-unquote honest evaluation of the professor. This was using MSU's own evaluation system. After that on April 25th 2019, more than two months after the initial incident, Mr. Ragland wrote to plaintiff that she was restricted from discussing the professor with any student in the course or any of the professor's classes. This is the bridge too far. It is one thing for a government institution to maintain discipline by limiting contact between a student and a professor. Fine. Again nobody is questioning that. But it is entirely another thing for a university to limit all contact between a student and dozens of other students, perhaps hundreds of other students. This is a prior restraint and a pretty expansive one at that. Now let's take a look at the law here. It is well established. Let me ask you a factual matter first. Does the record indicate what response, if any, there was to her email to the other students? Whether there was a flood of complaints about the professor in the system or anything like that? Do we know anything along those lines? I haven't seen any evidence of that, your honor. And I think this actually speaks to a weakness in the defense's case because a big part of their contention is that the email that Ms. Thompson sent was materially disruptive to the educational environment. Well, that was very speculative. How long was there between the time she sent the email and the time that she was restricted? So, I believe it was only a matter of days. I think she sent it sometime in late April and she got the restriction in late April as well. Now, it is well established law in the 10th Circuit that students in public education settings do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This was reinforced at the established Supreme Court level in Tinker, then recently reinforced actually in the Mahoney decision. And we have a 10th Circuit decision as well, Siemens versus Snow, an immensely important decision here that both sides actually rely on quite a bit. To restrict a student's speech in situations not involving school-sponsored speech, the speech must substantially interfere with the work of the school or impinge upon the rights of other students. And those are the two big... Counsel, let me just jump in at that point. So, the school has a faculty evaluation process as most colleges and universities do. It's relied upon for promotion and tenure decisions, the integrity of that process is important to the university. Why shouldn't the university be able to protect that process from interference or disruption? It really goes to whether we're dealing with protected speech here. Could you speak to that question? Your Honor, I would like to address your answer in two ways. Number one, bear in mind that the factual circumstances here indicate that Ms. Thompson said she wanted students to leave an honest evaluation. She used that term. I think if the school were asked, would you rather have honest or dishonest evaluations of your professors, then certainly the school would say, well, of course we want honest evaluations. I don't think she was undermining the process. I think she actually was reinforcing the process. Well, she said more than that though in her email. I mean, I'm looking at, it's in paragraph 35 of the complaint. I've heard so many of you say how horrible a time you're having in this class. And there are some bits of that that are ridiculous or downright unreasonable. I mean, why wouldn't that give the university some concern about how that's going to affect the accuracy of their evaluation, faculty evaluation? Well, let's take a look at that. First of all, I think the standard is whether what she did was materially disruptive, but what she was engaging in is really no different than what students have engaged in for centuries. We've all been to college, we've all been to law school, and we understand that sometimes students are unhappy with professors. Do we really want to with professors? That's exactly the problem here is that it's a content-based restriction that they're putting on her. If she was saying, look, this professor is a wonderful professor and I think everyone should leave glowing evaluations for her, we wouldn't be sitting here right now. But it seems to me like what MSU is trying to do is really restrict criticism of its professors. Well, Mahoney, which you mentioned, that was kind of a social media post, if I understand it correctly, high school or off-campus speech. I'm not quite sure how you categorize it, but the plaintiff used the school's internal communication systems, the email system. She accessed enrolled students in the class. We're in a higher education context versus the other cases you mentioned were not higher education. So there are some distinctions when we're trying to evaluate whether the school's conduct here was objectively unreasonable. Any reasonable administrator would know you couldn't do that. Is it important that she's using the school system to communicate with the students? I know you say she's asking for honest feedback, but I think it's a thinly veiled request for negative feedback. But I'm not sure that matters. Sure, Judge. I don't know if it matters either. I think, again, we're talking about the process of her talking at all. Well, and let's talk about her using the system of the university. Is that really a problem? University students may communicate with one another all the time, being critical of the university or being critical of various professors. They may actually speak on campus. They may have protests on campus. This may have taken a different form, but it's not a substantially different form, particularly when email has been used now for decades. Now, the trial court focused a lot on a social media aspect that simply just doesn't exist here. This was not posted on Facebook. It wasn't posted on Twitter or any other social media. This was an email that was sent out to other students. I don't think it would be different than any other email. I think we have to be very cautious here, too, about creating this distinction about whether emails can only be used to extol the virtues of the university and its professors or whether emails may properly be used to be critical of the university and the professors as well. We're getting into some pretty heavy-duty content-based restrictions if we're only going to tell students, well, only send emails that are positive for us rather than negative. I also think with respect here to what the official knew or didn't know, I think we all know that when we get into these qualified immunity issues, it's very rare that we're going to find cases that are exactly on point, but that's not the standard either. We've seen this in the Truman case where the court wrote that our analysis is not a scavenger hunt for prior cases with precisely the same facts, and the prior case need not be exactly parallel to the conduct here for the officials to have on notice of clearly established law. A couple of things here. Number one, we have- Counsel, in that regard, is Seamans your strongest case for clearly established law? I think Seamans is our strongest case in the Tenth Circuit, Your Honor, because, again, what we had there was a student who was critical of other students, was asked to do something to apologize to those students, and was then dismissed from the team. Here, we had someone who was official and was summarily restricted in her speech, but I don't think it's just Seamans if we take a more expansive view, because we also have a long line of Supreme Court cases that says that content-based restrictions have to be narrowly tailored, and they have to serve a compelling interest. Well, if we just look first at the compelling interest, the government does not have a compelling interest in restricting criticism against itself. The government has to tolerate criticism. With respect to narrowly tailored, this most certainly was not narrowly tailored. The original discipline from the school was narrowly tailored. If they had just kept the discipline to preventing her from being in this class and communicating with this professor, that's narrowly tailored. But then they took it too far and said, you cannot talk to students under any circumstances against this professor. And remember, it wasn't just the email that she sent, but it was also a private restraint, because what MSU was seeking here was actually prospective. They were saying going forward... Pardon me for interrupting. Could she have communicated with students that were not enrolled in Professor Lazorski's class? Well, what it says, the restriction says, restricted from discussing the professor with any student in the course or any of the professor's content of the statement. If this professor was teaching another class and there were other students there, she could not communicate with them. She could have protested outside the building where the class was or put a picket up in the student union still? I don't think so, Your Honor. And that's one of the problems with this restriction is that it's not narrowly tailored. This is just a blanket restriction, restricted from discussing the she had posted something on social media or had put a picket out across the street from MSU, then that could have gotten her into trouble as well. I'm at my three minutes, Your Honors, but of course, I'd be happy to... One quick question. Can we look at the in-class disruptions as a part of evaluating the school's response to her? I don't think so, Your Honor. And here's why. Because when she sent that email to other students, that's what created the warning from MSU. If she had never sent that email, we would have just stopped at the disruptions in class. She wasn't in that class anymore, and that would have been that. But we can't use it contextually to explain the purpose of the gag order. Well, I think the timeline here is important. She has this issue in class, number one. Number two, she's removed from the class. That's not a problem. At that point, I think it's safe to say that had nothing else happened, nothing else would have been sent. She wouldn't have been warned because there would have been no reason to give her a warning for everything. It was actually in response to the email that she sent that she was given the gag order. It's the email that led to the response and not the original conduct, which had already been successfully dealt with. I know you wanted to reserve the rest of your time. Let's turn it over to Ms. Powell. May it please the court, my name is Natalie Powell and I represent Thomas Raglin. Mr. Raglin is entitled to qualified immunity here because plaintiff has not met her burden to show that he violated her clearly established First Amendment right. Mr. Raglin also agrees that students don't completely shed their First Amendment rights at the schoolhouse gates, but our courts have recognized certain legally permissible restrictions on students' right to free speech in public educational settings. As plaintiff's counsel mentioned in Tinker, our United States Supreme Court acknowledged that a balance must be struck between upholding student free speech protections while also affirming the authority of school officials to control conduct in schools that's disruptive to the school's operations or invades the rights of others. But the Tinker standard has left open questions for decades, such as does that standard equally apply in the higher education setting? Does that standard equally apply to online or off-campus speech? And what type of conduct qualifies as a substantial disruption or invasion of the rights of others that a school has an interest in regulating? Let me let me ask you about that. Yes, we don't know how much Tinker applies to higher education, but if it's if it's prohibited, the government conduct is prohibited under Tinker, it's certainly prohibited with respect to older students and particularly in universities. Is that not reasonable? Well, your honor, I think Tinker again provides us a very general standard, but I would note this court had a recent decision in Hunt in which this court found that the school official there was entitled to qualified immunity for disciplining or regulating a online speech that was inflammatory political posts, you know, given that the student was a medical student. And so perhaps in some instances in higher education, the school might have a heightened interest in regulating certain student speech as well. Well, let me put it this way. Do you think that a university can restrict in any way student speech that is neither disruptive nor infringing of other students rights? I think I agree. Those are the that's the general standard. Yes. So there's not a question here of infringing other students rights. What in what way has the has your client have you argued that the speech that was that she in her letter was disruptive? There's been your art regarding how it was disruptive. Yeah, well, looking at the plaintiff's allegation as as a whole, your honor, you know, the complaints initially started, you know, potentially in class when she tried to sit on the floor and, you know, complained to the professor about not being able to do that. And then her complaints continued. She complained to various MSU officials about her complaints. And as a result, she was afforded a mediation and able to drop the class and get a tuition refund. But then after that, her communication still persisted in the form of the email to the other students still enrolled in the class. And how was that? How was that email? What has the university or your client argued was disruptive about that email? Well, the email itself is the only thing I saw is the only thing I saw is that a professor might be offended by it and want to work there if you have to be attacked like that. What was a were there? What were the arguments that were made district court or in your briefs here? Because the letter was disrupted? Certainly, your honor. Well, Mr. Ragland, you know, as he noted in his letters of plaintiffs, that her communications about the professor were persistent and disruptive. And but how that's what how is it disruptive? What what was argued to the to the district court? Let's start there. In what way was it argued to the district court that the letter the email was disrupted? Well, the the email potentially threatened the neutrality of Metro State's faculty evaluation process. I heard I heard Judge Matheson mentioned that. Was that presented? Was that an argument made in district court? Your honor, I believe we raised. I mean, I believe we raised that that Metro State found her communications to be disruptive. I think it was more. It was more discussed in our appellate briefs as well. But I thought the argument for disruption was not about the evaluation system was that it was encouraging false accusations or yeah, I thought that was that. I mean, that is one of our that is one of our arguments. I think the persistency of the communications. What's wrong with being persistent about exercising your rights? Why is why is that bad? Well, again, say something. Why can't you say it multiple times? Well, I think going back to I'm sorry, the the Tinker standard as well in the qualified analysis, Tinker does allow school officials to take action so long as disruption is reasonably forecasted. They don't have to wait till the disruption actually occurs. And so there isn't any clearly established law here indicating that Mr. Ragland did have to wait. You know, certainly if she had sent hundreds of more emails to the students about this professor, it could be distracting to the students and again, disruptive of the evaluation process. So but there's no clearly established law saying he has to wait until she sends that 10th email. Well, how long was it between the time she sent her email and the time she was restricted in her in her future context? I agree with I agree with Miss Thompson's counsel that I think it was a few days. Well, by that time, you can discern whether there's been any disruption to the evaluation system or whether it is encouraged by two pretty comments or inappropriate comments. So by that time, you're not predicting you should have pretty good data by that point, shouldn't you? Um, you know, potentially, potentially, Your Honor. Again, it's not, you know, it's not in the complaint here, whether there was a lot of response to the email or whether there wasn't. It's not where I'm coming from, that letter seems perfectly appropriate to me. I don't see what I can't see why if that is disruptive, that that means if you criticize the administration or faculty, then you can be sanctioned in some way. And that would be a terrible result. But I think this is totally fruitless, because students are going to make those comments anyway. Well, I think I think, again, that looking at all of the conduct of issue, Your Honor, this is more than just a student, you know, criticizing a faculty member. Again, the conduct goes back to, you know, when Mr. Raglan was looking at this, at her conduct in the class, as well, that continued, you know, complaints through appropriate channels, and then, and then this email encouraging the students still enrolled in the class to give negative evaluation. She went through appropriate channels, and they said, well, you should give an evaluation, submit an evaluation. Then it turns out she's not allowed to submit an evaluation because she's not in the class anymore. So then she says, look, I can't So if any of you have experiences like me, or actually, it's consistent with her letter. If any of you have had good experiences, fill out the evaluations. That's important. I think she says that's important for the university. It seems like a just a I just couldn't see what's wrong with that letter, unless you're worried that if faculty are criticized, then you won't be able to get faculty or something. And that's too bad. Well, I think, I think the concern is that she'd continue to communicate with the professor's students and continue to encourage them to give negative evaluations. And certainly, the school has a concern that impact the faculty evaluation process. Was it was the fact that I'll stop after this question that could I just go ahead. Well, I was just going to follow up with with what you what what Judge Matheson pursued before. Did they ever say this is fouling up the evaluation process? Was that ever given as a reason? I mean, we we we did express that I know in our appellate briefs, Your Honor, that that that was a concern. I'll shut up now. I was just going to ask, it seems in listening to this colloquy. It sounds more like the the conversation that would have some would would happen at summary judgment stage, especially on this issue of of disruption, but we aren't there. So isn't isn't disruption itself a fact bound issue? And we really shouldn't be questioning the complaint at this point, should we in that regard? Well, Your Honor, under the going back to the qualified immunity standard, plaintiff has the obligation to plausibly allege that she had a clearly established right here and her allegations do not meet that standard. I mean, again, going back to the cases that I just interject, maybe we ought to break down the qualified immunity into its two parts, because are you arguing that they haven't met both prongs of qualified immunity? Are you just saying that they haven't shown that there's a violation of clearly established law? We believe this court can resolve this case solely on the second prong, the clearly established law, because the cases that plaintiff has set forth, Tinker and Siemens versus Snow, do not provide a clearly established right here. They they were addressing very different types of student conduct and Tinker. It involves silent, passive speech by students who wanted to wear armbands protesting the violent attack that had occurred in the high school locker room. And the 10th Circuit labeled that as responsibly tailored speech to an audience that needed to know about it. What about, well, if this is on campus student speech, tell me if it's not, but if it's on campus student speech, why doesn't the Supreme Court's decision in, I believe it's pronounced Papish, provide clearly established law? Well, again, I remember, I recall that Papish had to do with, I believe, lewd, maybe lewd speech in the school newspaper. And so, again, this case has to do with repeated communications by a student targeting, you know, targeting how a class is conducted, as the district court found. So, again, I don't think gets us there. Plaintiff certainly hasn't put forth Papish as clearly established law. And let me just, let me just ask one other thing about clearly established law, because we also have, we have both the discipline, but we also have this no contact, do not discuss directive, which is an impediment to her speech. Why isn't that a prior restraint? And if it is, once we're in the prior restraint category, Supreme Court's been pretty protective of speech in that context. So, why wouldn't the directive be a violation of clearly established law as an unconstitutional prior restraint? I disagree that the law is clearly established on what constitutes a prior restraint, Your Honor. In Taylor v. Roswell, this court said that prior restraints are typically judicial orders or administrative licensing schemes, although the Supreme Court has held informal methods to chill speech can be prior restraints. The Supreme Court has also held that the prior restraint has to impose some sort of legal impediment. And plaintiff doesn't plead in she would have faced if she violated the directive, wouldn't she be subject to more discipline? Well, we don't, you know, according to the record before us, we don't, we don't know that. Could she have protested outside the classroom and had a, had a sit in on the student union and with the gag order prevented that, or would that have been permissible under your That's, that's a difficult question, Your Honor. I think potentially if she was communicating directly with the professor students during those exercises, it would have fallen within the within the restriction. But again, it would have had to been only to the professor's current Okay. All right. Thank you, counsel. Your time's expired. I think Mr. Reagan had a few minutes in the bottle left. I think the argument here your honors is that Mr. Ragland's actions did not violate clearly established law. That's simply not true. The court has noted that schools may restrict speech again, only under two conditions. If it is materially disruptive or invades the rights of other students, Mr. Ragland knew this. This is very well established law. Now let's move aside from the invasion of the rights of other students that simply didn't happen period. And then we talk about material destruction. Well, then essentially what the university is argument here arguing here is that any kind of negative criticism of a professor presents a material disruption to the school. If we take this argument to its logical extent, then it's not just any review by any student that's materially disruptive, but it is any criticism period that is materially disruptive. And I think as your honors have pointed out, at no point has the defendant said that there was actually a material disruption. What happened here instead was the speculation that there would be some kind of material disruption. But if the university is scared that evaluations are going to be materially disruptive, why have evaluations at all? We all know that whenever there are going to be evaluations, two things are going to happen. Number one, some of those evaluations are going to be negative. Number two, students are going to be discussing professors. This is a long thing. Well, professor so-and-so did this and I don't like him. How are you going to rate him? I'm going to rate him like this. I'm going to rate him like that. And then let's say university overhears this and says, well, you know what? You influenced that person and now it's going to be materially disruptive. That's a pretty substantial restriction on speech. All right, counsel, you appreciate the arguments. Your time's expired. You are excused and the case will be submitted. Thank you. Thank you.